**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
MIAMI DIVISION
Case No.: 1:22-cv-24119-FAM/TORRES

GR OPCO, LLC,

    Plaintiff,

  v.

ELEVEN IP HOLDINGS, LLC,
GRASSY CREEK LLC, CS IRWIN LLC,
IRWIN BACK COUNTRY GUIDES, LLC,
ALAN PIKE, and CHAD PIKE,

    Defendants,

  and

ELEVEN IP HOLDINGS LLC,

    Counter-Plaintiff,

  v.

GR OPCO, LLC, 11USA GROUP, LLC,
MARC ROBERTS, DENNIS DEGORI,
MICHAEL SIMKINS, MARC ROBERTS
COMPANIES LLC, PROPERTY
MARKETS GROUP, INC., PMG-11TH
STREET VENTURES, LLC, PMG-11TH
STREET VENTURES II, LLC, BLOCK 17
TRUSTEE, LLC, BLOCK 17 RESIDENTIAL
OWNER, LLC, and LION DEVELOPMENT
OPPORTUNITY FUND LLC,

    Counter-Defendants,

and

BLOCK 17 TRUSTEE, LLC, BLOCK 17
RESIDENTIAL OWNER, LLC

    Counterclaim-Plaintiff,

v.

ELEVEN IP HOLDINGS LLC,

    Counterclaim-Defendant

_____/

i

**PLAINTIFF AND COUNTERCLAIM-DEFENDANTS' JOINT OPPOSITION
TO AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT [DE 500]**

Plaintiff GR OPCO, LLC, *d/b/a* E11EVEN ("GR"), Counter-Defendants/Counterclaim-Plaintiffs BLOCK 17 TRUSTEE, LLC and BLOCK 17 RESIDENTIAL OWNER, LLC (Collectively, "Block 17"), and Counterclaim-Defendants 11USA GROUP, LLC, MARC ROBERTS, DENNIS DEGORI, MICHAEL SIMKINS, MARC ROBERTS COMPANIES LLC, PROPERTY MARKETS GROUP, INC., PMG-11TH STREET VENTURES, LLC, PMG-11TH STREET VENTURES II, LLC, LION DEVELOPMENT OPPORTUNITY FUND LLC, (collectively, all of the foregoing are the "Opposers"), jointly respond in opposition to Defendant/Counterclaim-Plaintiff, ELEVEN IP HOLDINGS LLC and its co-Defendants' (collectively, "EIP Parties") Amended Motion for Partial Summary Judgment ("Motion") [DE 500],[1] and state:[2]

## TABLE OF CONTENTS

I.   INTRODUCTION ......................................................................................................... 1

II.  GR'S ACQUIRED MARKS ARE VALID AND HAVE PRIOR RIGHTS TO SUPPORT COUNTS I AND II ................................................................................. 2

   A.  GR VALIDLY ACQUIRED THE ELEVEN INN AND 11TH AVENUE MARKS ....................... 2

   B.  GR DID NOT ABANDON ITS RIGHTS IN THE ACQUIRED MARKS ............................. 4

   C.  GR ACQUIRED THE RELEVANT PRIORITY OF TRADEMARK RIGHTS ....................... 6

   D.  LACHES DOES NOT BAR GR'S ENFORCEMENT OF THE ACQUIRED MARKS ......................... 8

---

[1] Pinpoint references to the Motion will be to the number at bottom center of page.
[2] "DMF" will refer to the Opposition to Movants' Statement of Materials Facts (disputed facts).

**III. GR'S CANCELLATION CLAIMS WILL SUCCEED DUE TO EIP'S FRAUD AND NON-USE** ................................................................................................ **10**

**IV. PER SE VIOLATIONS OF LAW OCCURED** ................................................... **14**

**V. EIP CANNOT DEFEAT GR'S FIFTH AFFIRMATIVE DEFENSE** ............................ **15**

**VI. EIP ENGAGED IN NAKED LICENSING** ........................................................ **16**

**VII. EIP FAILS TO OVERCOME OPPOSERS' DEFENSES OF LACHES, WAIVER, ACQUIESCENCE AND ESTOPPEL** ................................................................. **17**

**VIII. B17'S COUNTERCLAIMS AND DEFENSES SURVIVE** ........................................ **19**

   A. THE ELEVEN MARKS ARE MERELY DESCRIPTIVE ........................................... 19

   B. THE RECORD EVIDENCE CONTAINS SEVERAL INDICIA OF GENERICNESS ............................ 21

   C. STATUTORY FAIR USE DEFEATS ALL OF EIP'S CLAIMS AS TO WERM ............................. 22

**IX. CONCLUSION** ................................................................................... **25**

## I.    INTRODUCTION

The EIP Parties renewed their quest for partial summary judgment with yet another large dose of hyperbole. However, hyperbole is not evidence,[3] and evidence is what they are in short supply of and, thus, the reason they cannot demonstrate an entitlement to summary judgment.

The EIP Parties are so focused on semantic window-dressing in their Motion that they present arguments that will waste the Court's time due to fatal flaws. For example, had the EIP Parties actually read the express language of the assignment agreements, whereby GR acquired the ELEVEN INN, ELEVEN, 11, 11TH AVENUE and related, formative marks (the "Acquired Marks"), they would have seen clear language defining Marksmen, Inc. as an "Agent" and stating that the "Agent is not a party to this Agreement." DMF ¶ 50. Thus, the EIP Parties should have realized the futility of Section I.A. of their Motion. The balance of the EIP Parties' arguments in their Section I are similarly flawed. Not only do they ignore obvious provisions within the agreements but they also side-step sworn testimony that is inconvenient to their quest. Thus, as shown below, the EIP Parties fail to overcome the priority of GR's Acquired Marks.

The EIP Parties' effort to overcome GR's claims for cancellation of EIP's trademark registrations for fraud, non-use, and unlawful use also fail. Indeed, their arguments continue to reflect a fundamental misunderstanding of the claims and disregard of law, testimony and other evidence exposing the flaws in their position. For example, even though their own expert testified that: ████████████████████████████████ referring to launching a hotel without a certificate of occupancy (DMF ¶ 162), the EIP Parties nevertheless, in an effort to avoid the unlawful use in commerce doctrine, ask the Court to overlook numerous *per se* violations of building regulations meant to protect the public's safety (*e.g.*, the safety of their lodge guests).

The EIP Parties' challenge to GR's naked licensing defense also fails. Evidence shows that EIP not only failed to control the launch of the lodging and travel services but, for the years that followed, also allowed a "no control" system to persist to the deception of the public. Likewise, EIP's challenge to the Opposers' laches defense ignores evidence of its long-term knowledge of GR's registered rights in connection with temporary accommodations at hotels, and the context of EIP's claims, which makes their delay unduly prejudicial. Thus, as explained in more detail below,

---

[3] For example, EIP's brand is not a "long-renowned" or an "established" hotel and travel services brand. Instead, they have been consistently losing money since they began. DE 481 ¶¶ 44-45.

the Court should deny the EIP Parties' Motion.

This Court should also deny the EIP Parties' Motion as to Block 17 and their separate real-estate project, namely, West Eleventh Residences Miami ("WERM"). The Motion fails to identify a genuine issue of material fact about whether the phrase "West Eleventh Residences Miami" and "W11" constitute statutory trademark fair use. They do; they merely describe the "what" and "where" of WERM: residential condominiums located at 18 North*west 11*th Street in Miami's Park *West* neighborhood. The Motion also ignores that Block 17's descriptive/generic use of the term "Eleventh" is but one of hundreds—if not thousands—of third-party uses of "11" and "Eleven"-formative terms in the United States for various goods and services, including the four markets in which EIP purportedly operates: (i) hospitality; (ii) hotels; (iii) real estate; and (iv) travel. Not only does the crowded field weaken EIP's asserted marks for purposes of this Court's "forward" likelihood-of-confusion analysis; establish Opposers' good faith; *and* render "reverse" confusion inapplicable but also it demonstrates that EIP's asserted marks are generic (or, at a minimum, demonstrates a genuine issue of material fact about their genericness).

## II.    GR'S ACQUIRED MARKS ARE VALID AND HAVE PRIOR RIGHTS TO SUPPORT COUNTS I AND II

### A.  GR Validly Acquired the ELEVEN INN and 11TH AVENUE Marks

The EIP Parties' argument in its Section I.A. is defeated by the language of the trademark assignment agreements themselves, which both state: (i) Marksmen was the "'Agent', acting solely in its capacity as an agent for an anonymous purchaser (the 'Assignee')"; (ii) the "Agent is not a party to this Agreement"; and (iii) Marksmen was signing as "Agent for Assignee." DMF ¶ 50. Thus, though anonymous, GR is the Assignee party in both assignments at issue. *Id*. No transfer from Marksmen was needed because Marksmen was not a party but merely the agent of the Assignee, which was GR. *See id*. Consequently, the EIP Parties' argument fails.

The EIP Parties' argument in its Section I.B., regarding assignments in gross, likewise fails. Indeed, "in gross rules were not evolved for the purpose of invalidating all trademark assignments which do not satisfy a stereotyped set of formalities." *Int'l Cosms. Exch., Inc. v. Gapardis Health & Beauty, Inc.*, No. 00CV2280, 2001 WL 1944733, at *18 (S.D. Fla. Oct. 19, 2001), *aff'd,* 303 F.3d 1242 (11th Cir. 2002). Accordingly, it is well-established that: "[a]n assignment and license back to the assignor is valid commercial practice which enables the assignor-licensee to continue the same business." *In re Impact Distributors, Inc.*, 260 B.R. 48, 54, 2001 WL 273211 (Bankr.

S.D. Fla. 2001) (citing *Visa, U.S.A., Inc. v. Birmingham Trust Nat'l Bank,* 696 F.2d 1371 (Fed.Cir.1982)); *see* 3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 18:16.50 (5th ed.) ("where the assignee desires to achieve the assignor's priority date, the transaction can be structured as an assignment with a license-back").

In *Visa U.S.A.*, the Federal Circuit held that where there is a license-back, "there is no split of goodwill from the mark. The mark is used for precisely the same services as before the assignment with use by the licensee inuring to the benefit of the licensor as a related company." *Visa, U.S.A.*, 696 F.2d at 1377; *see Medscript Pharmacy, LLC v. D&D Pharma LTC, LLC*, 444 F. Supp. 3d 909, 915 (N.D. Ill. 2020) (marks licensed by to assignee while assignor completed setting up new business). Here, under the license-back provisions of the assignment agreements, GR's licensees' use of the 11TH AVENUE marks in Colorado, and the ELEVEN INN marks in Texas, provide continuity of use in the exact same manner as they were used prior to the assignments. *See* DMF ¶¶ 50, 70. Consequently, there is no doubt that the services currently offered under the Acquired Marks are not only substantially similar but **identical**.

The EIP Parties' argument that there is insufficient evidence that GR has actually exercised quality control over the use by 11th Avenue Corp. and SombrasGroup LLC of the 11TH AVENUE and ELEVEN INN marks, respectively, is not determinative. *Visa, U.S.A.*, 696 F.2d at 1377. The "principal requirement" is that the license-back provides for "adequate" control—*not perfect, invasive or obsessive control*. *See id*. Where the license-back has adequate control provisions, it is the EIP Parties' burden to show that there is no genuine issue of material fact as to a failure to actually exercise quality control. *Id*. As discussed in Section II.B. below (regarding involuntary abandonment), the EIP Parties have failed to satisfy that burden.

The EIP Parties also miss the mark with their "Acquisition of Assets" argument. "A valid transfer of a mark [] does not require the transfer of any physical or tangible assets. All that is necessary is the transfer of the goodwill to which the mark pertains." *Visa, U.S.A.*, 696 F.2d at 1377; *Int'l Cosms. Exch.*, 2001 WL 1944733, at *18; *Glamorene Prod. Corp. v. Procter & Gamble Co.*, 538 F.2d 894, 895–96 (C.C.P.A. 1976). Here, the goodwill was transferred and the licensees' continued use in the exact same manner as prior to the transfer has ensured that goodwill continues to accrue—for the benefit of the new owner, GR. *See* DMF ¶¶ 50, 70.

The EIP Parties' argument that GR's acquisition of the Acquired Marks in the midst of litigation shows "bad faith" (Mot. at 9) is also a non-starter. It is well-established that an assignment motivated by the assignee's desire to acquire a priority date earlier than a rival—**even in the midst of litigation**—does not invalidate an assignment. *Planetary Motion, Inc. v. Techsplosion, Inc.*, No. 99-6511-CIV, 2000 U.S. Dist. LEXIS 23518, at *6 (S.D. Fla. Jan. 31, 2000); *Wheelimage Corp. v. Axial Mfg.*, No. 8:23-cv-02206, 2024 U.S. Dist. LEXIS 38592, *19-20 (C.D. Cal. Mar. 5, 2024) (collecting cases); *Medscript Pharmacy*, 444 F. Supp. 3d at 915 (granting summary judgment); MCCARTHY, §18:16.50. Instead, it has been viewed as prudent. *See Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 678 (7th Cir. 1982). For example, in *Money Store*, the defendant knew of the plaintiff's and a third party's (United's) prior rights in the same mark. The defendant acquired United's rights and the plaintiff alleged it was a sham assignment. The court disagreed, explaining that, although plaintiff was an impediment, so too was United (the third party) and acquiring United's rights was consistent with a belief that—as between United and the plaintiff—United had the prior rights; thus, the acquisition was an exercise of sound business judgment. *Money Store*, 689 F.2d at 678.

Here, GR likewise exercised sound business judgment in purchasing the prior trademark rights of the rural, rustic ELEVEN INN (opened in 1946), and in purchasing the prior trademark rights of the 120-year-old, urban 11TH AVENUE HOTEL (now hotel *and* hostel) in Colorado. *See, generally*, DMF ¶¶ 48-87. The EIP Parties have taken the position that, in 2011—when they opened a single, rural **Colorado** two-story lodge (the Scarp Ridge Lodge)—EIP somehow established rights so large in scope that they should prevent others from offering hotel services in urban condominium towers. *See*, *generally*, DE 128. However, if such a right existed, then—*in 2011, when the EIP Parties claim to have begun use of EIP's Marks*—that right belonged to GR's Colorado predecessor, not EIP. *See* DE 481 ¶¶15-16. Thus, EIP was not the exclusive user in Colorado of such rights, did not have priority of rights and, consequently, was not entitled to register those rights. Similarly, in 2011, it was GR's predecessor, ELEVEN INN, who had priority as to rural, rustic accommodations that cater to adventure travelers. *See* DMF ¶48. Accordingly, GR did not act in bad faith but, rather, made prudent acquisitions.

### B.  GR Did Not Abandon its Rights in the Acquired Marks

The EIP Parties' Section I.C. argument, that GR involuntary abandoned the Acquired Marks by failing to exercise quality control, *i.e.*, naked licensing, also fails. A party seeking to

establish a forfeiture of trademark rights must satisfy a heavy burden, which requires strict proof. *See Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 387 (5th Cir. 1977); *Am. Foods, Inc. v. Golden Flake, Inc.*, 312 F.2d 619, 624–25 (5th Cir. 1963) ("The proof nowhere near approximated the burden of strict proof applicable in forfeiture cases").[4] Where the terms of a licensing agreement demonstrate that the licensor has maintained control over the quality of the goods and services, the opposing party must demonstrate that the licensor has not exercised that control. *Glow Indus., Inc. v. Lopez*, 273 F. Supp. 2d 1095, 1110, 2003 WL 21756474 (C.D. Cal. 2003) (licensee's lack of recollection of providing samples to licensor does not satisfy that burden; it must be assumed, for purposes of the motion of summary judgment, that the licensor maintained control); *see Geo. A. Hormel & Co. v. Hereford Heaven Brands, Inc.*, 341 F.2d 158, 160 (CCPA 1965) ("burden of proving Hormel abandoned the mark by failing to control the use by Stark under the license, is on appellee. Inferences which might be drawn from Hormel's testimony here do not meet that burden").

Notably, in this Circuit, "[r]etention of a trademark requires only minimal quality control, for in this context we do not sit to assess the quality of products sold on the open market." *Kentucky Fried Chicken*, 549 F.2d at 387 ("the consuming public must be the judge of whether the quality control efforts have been ineffectual"). Moreover, a trademark owner has an appropriate time, or grace period, for the exercise of such control over a licensee's use of a mark. This period varies according to the particular facts of each case. *Sheila's Shine Prod., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 125, 17 Fed. R. Serv. 2d 1435, 179 U.S.P.Q. 577, 1973 WL 405680 (5th Cir. 1973) (there, six years was not unreasonable delay),[5] *see U.S. Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 140, 209 U.S.P.Q. 457 (3d Cir. 1981) (delay of several years in revoking licensee's authorization); *Edwin K. Williams & Co. v. Edwin K. Williams & Co.-E.*, 542 F.2d 1053, 1060 (9th Cir. 1976).

Here, GR has not failed to control its licensees' use of the Acquired Marks. Each license-back provision in the assignment agreements contains quality control requirements, whereby: (a) the licensees must continue to meet its current standards, (b) gives GR the right to review

---

[4] Former Fifth Circuit decisions rendered on or before September 30, 1981, are binding in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

[5] Binding precedent. *See* note 4, *supra*.

marketing samples and third-party guest reviews, and (c) gives GR the right to communicate with the licensee regarding quality issues. As indicated by the above-cited cases, these provisions are sufficient to demonstrate that the GR has maintained control over the quality of the goods and services, and shift the burden to the Movants to demonstrate, by strict proof, that it has not.

Nevertheless, even if GR needed to make a greater showing before a burden-shift, it has done so. Dennis DeGori of GR inspected the online presence of the 11TH AVENUE hotel and hostel, including its website, TripAdvisor and Yelp materials. Michael Simkins read the third-party reviews as to both properties and the Acquired Marks. GR also engaged the assistance of outside counsel, Trevor Ward and Jordi Martinez-Cid, in the quality-control review. Dim Cos of E11EVEN IP LLC also assisted with quality control for both properties. Notably, GR's hospitality expert, Dr. Mody—Associate Professor of Hospitality Marketing at Boston University's School of Hospitality Administration—reviewed GR's quality control efforts and has opined that: "GR's quality control is consistent with hotel industry practice and convention." DMF ¶ 54. Therefore, the EIP Parties' argument involuntary abandonment argument fails.

### C.  GR Acquired the Relevant Priority of Trademark Rights

The EIP Parties' Section I.D argument regarding the "tacking" doctrine entirely misses the mark and, thus, fails. The EIP Parties misunderstand GR's application of priority of rights in the Acquired Marks. GR has not asserted that the real-estate projects in downtown Miami are using the Acquired Marks for hotel services—nor could they since construction is ongoing, those towers are not yet complete, no services are offered yet, and GR had already licensed its E11EVEN® mark for use in connection with the E11EVEN HOTEL & RESIDENCES and the E11EVEN RESIDENCES *BEYOND* (collectively, the "E11 Towers"). GR has also never alleged that the sale of real estate (condominiums) in those buildings was done under the Acquired Marks because GR's position is that real estate sales is an entirely distinct market than the experiential travel or temporary, vacation accommodation services that the EIP Parties offer.

Instead, GR has asserted priority of rights in the Acquired Mark because those prior rights show that the EIP Parties could not have established the priority of rights they purport to have, because GR's predecessors were already in the market long before EIP. GR's predecessors— particularly its Colorado predecessor—prevented EIP from having exclusivity and priority of rights in November 2011, particularly in the region (Colorado) in which the EIP Parties began their business with a single, rural lodge.

The EIP Parties' position is that, ever since they launched their experiential travel service in November 2011—with a single,[6] rural **Colorado** two-story lodge (the Scarp Ridge Lodge)— EIP has owned trademark rights so large in scope that they should block anyone from offering hotel services in large, urban hotels. *See*, *generally*, DE 451. If such a right existed in 2011, however, then it belonged to GR's **Colorado** predecessor who was using the 11 and 11TH AVENUE marks in downtown Denver, Colorado—*the closest urban setting to the EIP Parties' Scarp Ridge Lodge*—and had been for over one-hundred years. *See* DE 481 ¶¶15-16. In other words, the EIP Parties could not have established priority of rights in urban hotel services when it intervened into the market in 2011 because GR's Colorado predecessor already had those rights. The EIP Parties cannot assert what they never had.

Indeed, to the extent the EIP Parties contend that EIP's registered rights extend to large, urban hotel services, it was never entitled to register such rights because in 2011, in its Colorado market, it was not the exclusive user. In 2011, when EIP filed its trademark application with respect to hotel services (which led to ELEVEN trademark Registration No. 4,265,159), the EIP Parties had only that single, rural Colorado lodge. DMF ¶151. On November 14, 2012, when EIP filed its Statement of Use in support of the issuance of that Registration, there was *still* only that one Eleven Experience lodge in the United States, which as stated above, was in Colorado. *Id*.[7]

Thus, if anyone was entitled to enforce trademark rights in urban hotel services against GR, it would have been 11th Avenue Corporation—with its prior trademark rights arising out of the 120-year-old, urban 11TH AVENUE HOTEL (now hotel *and* hostel) and "11" formative marks in Colorado—not the EIP Parties. *See Medscript Pharmacy*, 444 F. Supp. 3d at 915. This is even more apparent given that GR's Colorado predecessor had a reputation that reached into Florida, drawing several hundred guests from Florida each year. *See* DMF ¶ 82.

Similarly, to the extent that the EIP Parties contend that the E11 Towers' inclusion of a pool and mere proximity to snorkeling or other outdoor watersport venues makes it an "experiential" travel hotel, then GR purchased the relevant rights. On the adventure travel front,

---

[6] Between the alleged launch in November 2011 and December 2013, the EIP Parties had only one property available for guests. They did not open the second property, which was in France, until the Winter 2014 season. DMF ¶ 151.

[7] In 2012 and 2013, no other U.S. properties were open for guests in the United States. *See* DMF ¶ 151. The second property, Chateau Pelerin, opened during the Winter of 2014, in France. *Id*.

GR acquired the prior trademark rights associated with the ELEVEN INN, which opened in 1946 and advertises its favorable location in proximity to snorkeling and scuba diving. *See* DMF ¶ 48. This predecessor also has a reputation that reaches into Florida to draw in a substantial portion of its guests. *See* DMF ¶ 82.

In sum, the EIP Parties' argument that GR did not acquire relevant trademark rights fails because GR did, in fact, acquire the relevant priority of rights.

### D.  Laches Does Not Bar GR's Enforcement of the Acquired Marks

It is only after the defendant has established the elements of its laches defense that the burden will shift to the plaintiff to raise a genuine issue of material fact as to the elements of laches. *Ideal Image Dev. Corp. v. Idealaser Hair Removal Corp.*, No. 18-20927-Civ-Cooke, 2019 U.S. Dist. LEXIS 144098, at *9 (S.D. Fla. June 25, 2019). Here, the EIP Parties have failed to carry the burden on their laches defense to GR's claim of infringement of the Acquired Marks. *See Mystique, Inc. v. 138 Int'l, Inc.*, 375 F. App'x 997, 999 (11th Cir. 2010). Thus, the burden does not shift to GR.

For example, regarding the amount of delay, "courts measure 'from the time the plaintiff knew or should have known **that it had a provable claim** for infringement.'" *Ideal Image Dev.*, 2019 U.S. Dist. LEXIS 144098, at *8 (quoting *Kason Indus. v. Component Hardware Grp., Inc.*, 120 F.3d 1199, 1206 (11th Cir.1997) (emphasis added)). Such knowledge is not equivalent to the mere constructive notice of EIP's trademark application to the USPTO in April 2011 or, alternatively, the July 2012 issuance of their first trademark registration, as the EIP Parties argue. This is particularly so given that "plaintiffs need not file suit as soon as they discover potential infringement, but rather when 'the likelihood of confusion looms large.'" *Id.*

The EIP Parties also simplistically argue that their use was "open and overt." Notably, however, they ignore the fact that even their own founder, Chad Pike testified that: ███████████████ ████████████████████████████████████████████████████████████ ████████████ DMF ¶ 4. The EIP Parties also ignore facts such as: prior to November 2011, ████ ████████████████████████████████████████████████████████████ ████████████████████████████ the launch party was by invitation only and, thus, was not open to the public at large; and that their marketing and collateral describe it as "not a hotel company." DMF ¶¶ 1, 4, 9, 12, 23, 154. They also ignore the testimony of GR's predecessors, who both testified that they had not heard of the Defendants and their use of ELEVEN prior to

receipt of their subpoenas in this action. DMF ¶ 87. In light of these facts, the EIP Parties cannot satisfy their burden to show when GR's predecessors should have known of the infringement. *See Mystique, Inc.*, 375 F. App'x at 999 (defendant "did not carry its burden of proof; it did not prove when [plaintiff] knew or should have known of the infringement of its mark. Failure to prove that fact is fatal to the laches defense"); *Ideal Image Dev.*, 2019 U.S. Dist. LEXIS 144098, at *10-11 ("courts have denied summary judgment on laches when there is a dispute as to when a plaintiff knew of alleged infringement").

Even if the EIP Parties had met their burden on establishing the period of delay, it would have been excusable for GR's predecessors to await a provable claim under the doctrine of progressive encroachment. *See Kason Indus. v. Component Hardware Grp., Inc.*, 120 F.3d 1199, 1205-06 (11th Cir. 1997) ("The doctrine of progressive encroachment is relevant"). The EIP Parties only recently expanded their properties to include a non-luxury property in the nature of two single rooms above a bar. *See* DE 239 at 8. As the EIP Parties have often highlighted the "budget" nature of GR's predecessors' hotel services (*see, e.g.*, DE 247 at 13), awaiting the EIP Parties' encroachment into budget-friendly temporary lodging was reasonable. *Id.*; *see Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1517 (11th Cir. 1984); *Ideal Image*, 2019 U.S. Dist. LEXIS 144098, at *8 ("plaintiffs need not file suit as soon as they discover potential infringement, but rather when the likelihood of confusion looms large.").

Because the EIP Parties failed to meet their burden on delay, the Court need not address the element of undue prejudice. *Ideal Image Dev.*, 2019 U.S. Dist. LEXIS 144098, at *10-11. Nevertheless, the EIP Parties also fail to carry their burden as to that element. "Mere delay, without resulting injury to defendant, is not sufficient to prevent relief for infringement." *Ip-6 Int'l, Inc. v. Nutrigold, Inc.*, No. 6:21-cv-1507-CEM-DCI, 2023 U.S. Dist. LEXIS 236031, at *9 (M.D. Fla. Mar. 31, 2023). Here, the EIP Parties failed to show any undue prejudice but, instead, only a vague assertion of an undifferentiated gross figure for the brand's entire U.S. and foreign endeavors. However, undue prejudice must be analyzed in the context of delay. *Kason Indus.*, 120 F.3d 1206. Here, record evidence shows that EIP was undeterred by a Thompson Search report containing over 185 other "Eleven" references—including GR's predecessor for the "11" and "11TH AVENUE" hotel marks. Even after GR filed its infringement claim as to the Acquired Marks, the EIP Parties continued to spend money on promoting its hotel services, including their recently

added budget-friendly rooms of the Public House bar. Thus, the evidence indicates that the EIP Parties "would have spent the money even if [GR's predecessors] had notified it immediately" and that they were committed to the Eleven brand, believing they would prevail against any of the 185 owners of the marks and trade names listed in the Thompson search report. Consequently, the EIP Parties have failed to satisfy their burden on the element of prejudice as well. *See AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1546-47 (11th Cir. 1986). In light of the foregoing, the EIP Parties' laches defense in Section I.E. of their Motion fails.

### III.   GR'S CANCELLATION CLAIMS WILL SUCCEED DUE TO EIP'S FRAUD AND NON-USE

The parties agree that, under the Lanham Act, the Court has the power to order the cancelation of trademark registrations, and that one basis for doing so is fraud. 15 U.S.C §§ 1119; 1064(3); *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1209 (11th Cir. 2008). The parties also agree that part of GR's Count III cancellation claim is based upon several fraudulent declarations submitted to the United States Patent and Trademark Office ("USPTO") as part of EIP's effort to obtain the subject trademark registrations. GR similarly plead fraud upon the USPTO in its Sixth and Thirteenth Affirmative Defenses. DE 472, at 64, 66. The parties' disagreement is as to the evidence. GR contends, and shows below, that there is clear and convincing evidence of EIP's fraud upon the USPTO.

Clear and convincing evidence arose in discovery that Alan Pike, the purported signatory of those declarations, was not actually the signer. Alan Pike, in sworn testimony, was clear that: he was █████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
███████████   DMF ¶ 91. Moreover, there is an absence of evidence. For example, there is no evidence that Alan Pike ever signed Trademark Application Serial No. 85/289,682 for the standard character (word) mark **ELEVEN** in Class 43 for hotels and hotel services—or the later Statement of Use submitted in support of that application—both of which eventually led to the December 25, 2012 issuance of Registration No. 4,265,159. *See* DMF ¶¶ 91-95. Instead, an unknown person— *likely EIP's outside counsel*—typed Alan Pike's signature into those declarations, intending that the USPTO rely upon them as though they were the signature of Alan Pike, the named declarant.

*See id*. Thus, regardless of whether Alan Pike knew of the third-party use, the incorrect first-use date, or that EIP was not using the marks—*either itself or through a related entity*—those declarations were knowingly and materially false for the simple but critical fact that Alan Pike did not sign them and, thus, did not make those declarations.[8]

Although fraud may occur in many ways, one type is the submission of a forged signature. *See Mini Melts, Inc. v. Reckitt Benckiser, Inc.*, No. 4:07-cv-271, 2009 U.S. Dist. LEXIS 148588, at *3-8 (E.D. Tex. Feb. 26, 2009); *In re Dermahose Inc*., 2007 TTAB LEXIS 25 (TTAB, Feb. 13, 2007). Each document requiring a signature that is submitted to the USPTO must bear one that was personally entered by the person named as signatory. 37 C.F.R. § 2.193; *In re Dermahose Inc*., 2007 TTAB LEXIS at *7. The rules do not permit attorneys (or anyone else) to sign another person's declaration. *In re Dermahose Inc*., 2007 TTAB LEXIS at *9. In *In re Dermahose Inc*., an attorney had—*with authorization*—signed the company president's name to a statement of use declaration in support of a trademark application. While both the company president and the company's attorney were each proper signatories, the question was whether the attorney was permitted to sign the company president's declaration. It was held that he was not. *Id*., at *10. Similarly, in *Mini Melts, Inc.*, the company's attorney submitted a declaration of use wherein she represented that the signature thereupon was that of the company's president, Mr. Mosey. The court considered whether the attorney's forgery of Mosey's signature was a false representation of material fact and found that it was. 2009 U.S. Dist. LEXIS 148588, at *5 (recommending cancellation of the registration).

Here, the USPTO issued to EIP several trademark registrations arising from applications and statements of use each purportedly signed by EIP's manager, Alan Pike, including but not limited to Registration No. 4,265,159 for the standard character (*word*) mark ELEVEN in Class 43 for hotels and hotel services. However, based on the sworn testimony described above, it is clear that Alan Pike did not sign the trademark applications and did not sign the statements of use and, thus, those signatures purporting to be his are, instead, forgeries. Accordingly, as in *Mini Melt* and *In re Dermahose*, the forged signatures of Alan Pike are false representations of material fact

---

[8] To the extent any declarations were signed by EIP's trademark counsel, she had first-hand knowledge of the search results showing third-party use. Movants' SOF ¶¶ 98, 100.

and, thus, EIP's Trademark Registrations Nos.: 4,265,159; 4,621,491; 4,284,681; 4,269,438; 4,269,487; and 4,610,119 should be cancelled.

With respect to GR's cancellation claim based on non-use, the EIP Parties' argument also fails. The EIP Parties base their argument on use by "Eleven"—which they define as the entire group of defendant companies and individuals. However, the use that matters is the trademark applicant's use. *See* 8 Trademark Manual of Examining Procedure 1201 (2024). GR alleges that EIP, the applicant, never used the applied for ELEVEN and ◆ marks in connection with hotels, hotel services or other temporary lodging services. DE 140¶¶ 202-206, and the evidence supports GR's position. Consequently, Registration Nos. 4265159, 4621491, and 4384681, which relate to such services, were *void ab initio* and should be cancelled.

Acknowledging that it has never engaged in first-hand use of the asserted marks, EIP states in its footnote no. 13 that it relies upon 15 U.S.C. § 1055, otherwise known as the "related companies doctrine," to establish its use in commerce of the subject marks in connection with hotels, hotel services or other temporary lodging services. However, an applicant may only have the benefit of that doctrine if: (1) the marks may be **used legitimately** by the related companies; (2) the first use of the mark was **controlled** by the applicant; and (3) the related companies did not use the mark in such a manner as to **deceive** the public. *Id.*

Under the related companies doctrine, "[t]he question of who is the owner of a mark and, therefore, entitled to register is not a mere technicality." *In re Wella A.G.*, 787 F.2d 1549, 1555 (Fed. Cir. 1986). This is particularly apparent where legal requirements dictate which entity may perform which service. *See In re Citibank, N.A.*, 1985 TTAB LEXIS 133, *10 (TTAB Jan. 11, 1985) (finding applicant's position that the entities functioned as one source contradicted by fact that they were not both authorized to perform the service).

Here, EIP fails this doctrine's test. First, until December 15, 2011, when the Town of Crested Butte issued a temporary certificate of occupancy for the Scarp Ridge Lodge, no one could legitimately offer hotel services. Moreover, even after obtaining a full certificate of occupancy for Scarp Ridge Lodge, the only entity that the Town of Crested Butte issued a hotel operator's license to was **CS Irwin**. *See* DMF ¶ 152. In fact, until late 2013, when additional properties were added, there were no other hotels within which to render services. The second property to open was in France, Chateau Pelerin, in December 2013 for the "Winter of 2014" season. *See* DMF ¶ 151.

However, CS Irwin, the only entity legally authorized to operate a hotel on or before November 14, 2012, when EIP filed its Statement of Use in support of the issuance of Registration No. 4,265,159 (*i.e.*, ELEVEN for hotel services), was **uncontrolled**. In the terms and conditions of the elevenexperience.com website, **CS Irwin disavows being the operator of any hotel property**, and Kyra Phelps testified that CS Irwin does not operate the property; instead IBCG is the operator. DMF ¶ 153. There is no record evidence of the Town of Crested Butte issuing a hotel operator's license to IBCG for Scarp Ridge Lodge.

Nevertheless, it was CS Irwin that put itself out front in launching the brand. The launch party was invitation-only and, notably, the invitation: (a) was sent by CS Irwin; (b) displayed CS Irwin's "CS" logo; and (c) read: "**CS Irwin** cordially invites you to preview the Eleven Experience at the newly opened Scarp Ridge Lodge." DMF ¶ 154. The invite also stated: "RSVP…to eleven@*csirwin*.com." *Id*. CS Irwin's conduct was intentional and aimed at attracting CS Irwin's existing clients who "████████████████████████████████████ ███████████████████████████████████ DMF ¶ 155. In fact, ████████████████ ████████████████████ DMF ¶ 156.

In contrast, EIP was noticeably absent from the launch. Neither Chad Pike nor anyone from his family attended the launch party. Current executives, such as Ian Huschle and Ian Wick, were not yet employees of any of Mr. Pike's many LLC.s at that time; Huschle did not join Grassy Creek until June 2013, and Wick did not join any of the Defendant companies until early 2016. Thus, they also were not in attendance to perform any control. DMF ¶ 157. Moreover, EIP is a Delaware LLC that has never registered to do business in Colorado. The absence of public records in the State of Colorado confirms such. DMF ¶ 158. Thus, it could not have legally launched any business there. Similarly, Grassy Creek did not register to do business in Colorado until January 3, 2012, which was months *after* the November 11, 2011 launch date. DMF ¶ 159. Thus, it too could not have operated in Colorado to control the launch. The fact that EIP did not (and does not) actually control use of the subject marks was summed up by Chad Pike, the founder of the brand, when he stated that he has a ██████████████████ and █████████████████████ ██████████████████████████ DMF ¶ 160.

CS Irwin's conduct of making itself and its "CS" logo prominent in the launch of the Eleven brand shows its use the Eleven mark in such a manner as to **deceive** the public. Moreover, CS

Irwin's disavowing of being the hotel operator, when it was the only entity holding an operator's license, furthered the deception of the public.

Finally, to the extent that the EIP Parties argue that the USPTO accepted EIP's specimen of use, they may not rely on such. Although a certificate of registration is *prima facie* evidence of *some* facts shown on the certificate, it is not evidence of **use** of the subject mark but, instead, simply the ***right*** to use. *See* 15 U.S.C. § 1057.

In sum, the record facts show that EIP was not entitled to rely on the related companies doctrine to establish its own use in commerce. *See* 15 U.S.C. § 1055. Therefore, it is clear that EIP did not use the subject marks and, thus, Section II.B. of the EIP Parties' Motion fails.

## IV.    PER SE VIOLATIONS OF LAW OCCURED

The Eleventh Circuit has not "refused" to adopt the unlawful use doctrine. To the contrary, it found that, to prove the doctrine applies, one must show either: (i) a finding of non-compliance by a court or government agency; *or* (ii) a *per se* violation of law or regulation that is material to the party's sale of its goods or services. *FN Herstal SA v. Clyde Armory Inc*., 838 F.3d 1071, 1087 (11th Cir. 2016). The *FN Herstal* court declined to apply the doctrine simply because there was insufficient record evidence of the alleged unlawful use.

In contrast, here, there is clear and convincing evidence of EIP's *per se* violation of law. Crested Butte Municipal Code Section 18-13-70(a) clearly states that:[9] "**It is unlawful** for the owner of a structure or any other person to **rent**, **occupy** or **use** any structure within the Town **without obtaining, in advance**, a **certificate of occupancy**." The EIP Parties violated that regulation by engaging in *all three* of the prohibited activities.

Crested Butte government did not issue a temporary certificate of occupancy for the Scarp Ridge Lodge—*the EIP Parties' only "hotel" property at the time*—until December 15, 2011, and did not issue the full Certificate of Occupancy until January 17, 2012. DMF ¶ 13. On both the temporary and full Certificates of Occupancy, Crested Butte Club LLC is shown to be the owner of the property, but Defendant IBCG claims to have **rented** that property since at least November 11, 2011 for purposes of operating a hotel therein. DMF ¶¶ 13, 161. The EIP Parties admit that about 150 persons **occupied** Scarp Ridge Lodge on November 11, 2011 for purposes of a party.

---

[9]  https://library.municode.com/co/crested_butte/ordinances/municipal_code?nodeId=1169432, at p. 38. (last visited Aug. 11, 20224). Opposers request judicial notice of this regulation.

The EIP Parties also assert that the November 11, 2011 "launch" event at Scarp Ridge Lodge commenced EIP's **use** of the mark at that property for rendering hotel services. Thus, there is clear and convincing record evidence that by renting, occupying and using Scarp Ridge Lodge prior to December 15, 2011, EIP and its co-Movants were in *per se* violation of the law.

The materiality of Crested Butte Municipal Code Section 18-13-70(a) to the offering of hotel and travel services to the public cannot be doubted. It is a truism that the public policy surrounding building codes, including the requirement of a C.O. before allowing renting, occupying and use of a building, is to protect public safety. This is particularly important where the building is of a commercial nature and, thus, open to the public.

Here, there is clear and convincing evidence that the EIP Parties willfully and *per se* violated the law meant to prevent an owner, renter and others from placing public safety at risk so that they could have a cute "launch" date of "11-11-11." In doing so, they placed that marketing goal over the public safety of 150 persons. *See* DMF ¶¶ 13, 162-163. Accordingly, the EIP Parties' argument in Section III of their Motion fails.

## V.     EIP CANNOT DEFEAT GR'S FIFTH AFFIRMATIVE DEFENSE

The EIP Parties' new argument in Section III of their Motion fails. Although 15 U.S.C. §1111 does not apply where a defendant had actual notice of the asserted registration, here there is no evidence that GR had actual notice of EIP having a trademark registration of the word "eleven" before it licensed its E11EVEN mark for use on the subject towers, or even before the project was publicly announced. The testimony of Mr. Sneeringer that EIP cites does not establish

███████████████████████████████████████████████████████████████████████

███████████████████████ DE 380, Ex. 248 at 228-233.

Moreover, the interrogatory response that EIP cites states only that ███████████████

███████████████████████████████████████████████████████████████████████

███████████████ *Id*., at Ex. 524 at Rog 22. Thus, interrogatory response No. 22 also does not demonstrate actual notice of an "Eleven" trademark registration. Furthermore, Michael Simkins testified that ███████████████████████████████████████████████████████

███████████████████████████████████████████████ DE 507. ¶59. Accordingly, GR's Fifth Affirmative Defense is valid and there is no genuine issue of fact that would prevent this Court from granting GR summary judgment thereupon.

## VI.     EIP ENGAGED IN NAKED LICENSING

The EIP Parties' argument in Section IV of their Motion also fails. *If* EIP was the proper registrant and owner—*which record facts show it was not*—it is clear that it engaged in naked, uncontrolled licensing. In fact, EIP's failure of control began in the lead up to and "launch" of the services. In November 2011, there was no written licensing agreement(s) in place to delineate any purported quality control parameters. DMF ¶ 5. In fact, between November 2011 and March 31, 2017, there were no written license agreements between EIP and CS Irwin or IBCG. *Id*. Moreover, the March 2017 written license is prospective and does not recognize any particular prior verbal license; instead, it vaguely refers only to ████████████████████████████ during some unknown previous time.[10] *Id*.

EIP's argument that it relied on its Manager, Grassy Creek, also does not show control; instead, it further highlights the failure of control. Grassy Creek did not register to do business in Colorado until January 3, 2012; thus, it could not have operated in Colorado to manage or control anything. Moreover, placing Grassy Creek in charge of control was akin to placing the fox in the henhouse, as Grassy Creek was double-dipping. Specifically, Grassy Creek was also employed by IBCG and CS Irwin, the purported licensees. Thus, if EIP put Grassy Creek in charge of assessing the quality of the licensees' rendered services, it would be—in essence, asking the judge to judge himself. A clear conflict; such an arrangement is not just ineffective control, it is no control.

The ineffectiveness of such "control" is clear in that neither EIP nor Grassy Creek, its manager, prevented the purported licensee CS Irwin from representing to the public that it was launching the "Eleven Experience" at Scarp Ridge Lodge, and from using CS Irwin's "CS" logo to do it. *See* DMF ¶ 154-155. Both the invite and the rsvp address on the invite, eleven@*csirwin*.com, led to a public impression that CS Irwin was taking its brand in a new direction, and that was an intentional choice to appeal to CS Irwin's existing client-base. *Id*.

EIP and Grassy Creek's failure of control also allows CS Irwin to misrepresent to the public that it is **not** the operator of the hotel, even though it is the *only* entity that is licensed to operate a hotel. *Compare* DMF ¶153 *with* ¶ 152. In fact, CS Irwin and IBCG seem confused as to which

---

[10] If there was a similar but verbal year-long, auto-renewing license, it would have been invalid under Florida's Statute of Frauds. The 2017 written license chose Florida as governing law.

16

entity operates the hotel and which entity acts as payment processor for the booking service. Both have made conflicting fictitious name filings, with CS Irwin filing a fictitious name of "Eleven" for use in offering "Adventure travel services including accommodations, food and lodging" despite disavowing such services in its terms and conditions. Whereas IBCG filed a fictitious name of "Eleven" for use in performing payroll services for an experiential travel brand, which is not a service mentioned in the March 2017 license agreement. DMF ¶¶ 5, 164. The failure of control also had the effect of allowing several third-parties to confuse the public with more fictitious "Eleven" names on various services in Colorado. For example, Wilderness Machines, LLC filed to use the name "Eleven" for capital services, and Frontier Cuisine LLC filed to use the name "Eleven" for culinary services. There are no controlled licenses of record for either of these services. *Id*.

In sum, the facts show that EIP engaged in pervasive naked licensing from the start and continues to do so. Thus, Section IV of the EIP Parties' Motion fails.

## VII.   EIP FAILS TO OVERCOME OPPOSERS' DEFENSES OF LACHES, WAIVER, ACQUIESCENCE AND ESTOPPEL

GR owns U.S. Trademark Registration No. 5921909 (the "'909 Registration") for use of its E11EVEN® mark in connection with providing temporary accommodation at hotels, which was issued nearly five years ago in November 2019. DE 248 ¶213. Unlike its laches argument in Section I.E. of its Motion, EIP does not wish to discuss constructive notice here. Here, however, there was more than constructive notice. Since 2016, EIP has used the Thompson trademark watch service to monitor for the filing of any "Eleven" trademark applications or variations thereof. Ms. Phelps testified: ███████████████████████████████████████████ including ██████████████████████████ and that ███████████████████████████. Thus, not surprisingly, Mr. Huschle testified that he ████████████████████████████████████ Thus, EIP knew of GR's rights to E11EVEN for "temporary accommodations at a hotel" *for more than four years*.

Moreover, EIP also should have known of GR's temporary accommodations services through EIP's founder, Chad Pike. Indeed, Mr. Pike, testified that he knew of GR's E11EVEN night club since around the time it launched in 2014 due to his travels through Miami and that people in the travel industry would ask him whether EIP was associated with the nightclub called E11EVEN. DMF ¶ 165. In light of Mr. Pike's travels through Miami and the alleged inquiries, the

EIP Parties should have been aware, **as early as 2014 and as late as 2018**, that GR was promoting its temporary accommodation services at pop-up events under the E11EVEN mark even though the rooms were located within third-party hotels. In fact, several of GR's witnesses testified to those E11EVEN branded activities, which have occurred in both Miami and Las Vegas. DMF ¶ 117.[11] Thus, EIP has inexcusably delayed for six to ten years, creating a presumption of laches. *See Ideal Image Dev.*, 2019 U.S. Dist. LEXIS 144098, at *8-9.

EIP's inexcusable delay unduly prejudiced Opposers. Undue prejudice must be analyzed in the context of delay. *Kason Indus.*, 120 F.3d 1206. Here, the context involves a limited supply of real property being sold in a fast-paced urban real estate market. *See* DE 481 ¶ 41. Opposers were not selling fungible goods over indefinite periods of time. In January 2021, the national press covered GR's announcement that E11EVEN branded condominiums would be built in downtown Miami, and by the time this litigation commenced, that limited supply of real property in the E11EVEN branded towers was nearly sold out. *See id*.

With respect to acquiescence, EIP has made the requisite active representation on the record of this action. Indeed, EIP conceded that GR's E11EVEN marks used in connection with nightclub services and any other non-hotel services do not infringe EIP's marks, stating:

> GR owns a nightclub…which it brands using the term 'E11EVEN'…Though its launch post-dates [EIP's] usage of ELEVEN, **the nightclub did not conflict with Eleven's trademark rights**, **and is not the issue in this case**. Rather, this case is about GR's recent plans to expand its business by opening luxury hotels…

DE 60 at 2 (emphasis added); *id*.at 13, ¶ 64 (EIP "denie[d] there is an actual controversy …concerning GR's use of 'E11EVEN' with its nightclub and other **non-hotel** services…").

EIP has also, in its Motion, actively represented that they do not challenge any hotel booking service that GR performs under the E11EVEN mark with respect to stays at third-party hotels. DE 247 at 31 ("Eleven's claims are…not about GR booking rooms at unaffiliated third-party hotels…for employees, talent or events at its nightclub."). Consequently, EIP has acquiesced in the use of GR's E11EVEN Marks with respect to the above stated services.

Finally, GR understands that EIP is not challenging its estoppel defense (Aff. Def. 1, DE 107 at 18). DE 247 at 31. However, EIP does challenge B17's estoppel defense and, in that regard,

---

[11] GR relies on Movants' statement that they do not challenge any hotel booking service that they perform under the E11EVEN mark with respect to stays at third-party hotels. DE 247, at 31 ("Eleven's claims are…not about GR booking rooms at unaffiliated third-party hotels").

EIP's challenge fails. Equitable estoppel has three elements: "(1) misleading words, conduct, or silence; (2) reliance; and (3) material prejudice." *Harod v. Sage Products, Inc.*, 188 F. Supp. 2d 1369, 1378-79 (S.D. Ga. 2002). Block 17's 2022 trademark search revealed numerous third-party uses of "11" and "Eleven"-formative terms and marks for various goods and services throughout the United States. DE 275-13 at Rog. 17; DE 275-55. EIP's apparent willingness to co-exist alongside these numerous third parties was among the reasons that Block 17 believed it, too, could use an "11" and Eleven-formative term—*i.e.*, "W11" and "West Eleventh Residences Miami"—to describe the "where" and "what" of WERM without violating anyone's alleged trademark rights. DE 275-13 at Rogs. 2, 15, 17.

These facts are squarely inapposite with EIP's cited case—*Buccellati*, *Holding Italia SPA v. Laura Buccellati, LLC*, 5 F. Supp. 3d 1368, 1375 (S.D. Fla. 2014)—wherein there was no evidence that the plaintiff was seemingly willing to co-exist alongside a crowded field in the United States. In fact, the third-party uses in *Buccellati* were *outside* of the United States; unlike EIP, the "plaintiffs [were] the sole registrant for any mark incorporating 'Buccellati' in the United States." *Id*. at 1377. Moreover, Block 17 indisputably has suffered material prejudice by relying on EIP's co-existence with the crowded field. Unlike the hundreds—if not thousands—of members of the crowded field that EIP has not protested, Block 17 has expended significant time and monetary resources on defending its fair use of "West Eleventh Residences Miami" and "W11" in this lawsuit. Consequently, EIP cannot overcome Block 17's estoppel defense.

## VIII.   B17'S COUNTERCLAIMS AND DEFENSES SURVIVE
### A.  The ELEVEN Marks are Merely Descriptive

EIP fails to raise a genuine issue of material fact about Block 17's entitlement to summary judgment on Counts II and IV of its Counterclaims. Opp. at 22-23; DE 468 at 93-7. Block 17 can challenge the validity of EIP's contestable and unregistered marks on *any* ground, including mere descriptiveness and lacking secondary meaning. *See Caribbean Weddings, Inc. v. Caribbean Wedding Ass'n, LLC*, No. 08-61457-CIV, 2009 WL 10667532, at *6 (S.D. Fla. Sept. 8, 2009) (denying summary judgment and not addressing likelihood of confusion when the validity of plaintiff's mark had not been established after defendants lodged descriptiveness and secondary meaning challenges). Block 17 does that in Count II.  DE 468 at 94, ¶ 98. In Count IV, Block 17 seeks a declaration of non-infringement. *Id*. at 96-97. In support of non-infringement, Block 17 argues that that EIP's asserted marks "are conceptually and commercially weak." *Id*. at 96, ¶ 106.

EIP's Counterclaims and the record evidence demonstrate ELEVEN indisputably is at least descriptive (if not generic). The parties are in vigorous agreement that EIP adopted the ELEVEN mark for its laudatory significance. DE 253-8 at 6; DE 259-9 at 9; DE 253-10 at 3; DE 260-17 at 57:4-15 (articles showing that EIP chose the term Eleven to indicate to consumers that its services are, on a scale of 1 to 10, an 11). It is the law in the Eleventh Circuit that a laudatory term is descriptive. *FCOA LLC v. Foremost Title & Escrow Servs.*, 57 F.4th 939, 951 (11th Cir. 2023) ("Foremost" for insurance "is a descriptive mark, a self-laudatory term meaning the best."); *Popular Bank of Fla. v. Banco Popular de Puerto Rico*, 9 F. Supp. 2d 1347 (S.D. Fla. 1998) ("Descriptive marks include marks that are simply descriptive, laudatorily descriptive, and geographically descriptive."). And for good reason. As Professor McCarthy explains, "[m]arks that extol some feature or attribute of the goods or services are 'laudatory' and fall into the descriptive category […] Self-laudatory or 'puffing' marks are regarded as a condensed form of describing the character or quality of the goods." McCARTHY, § 11:17. It is the minority rule, and never the rule in the Eleventh Circuit, that a laudatory term is "suggestive." The two cases that EIP cites are both within the Second Circuit, which is the "one circuit" to take that position. *See* Callman on Unfair Competition, Trademarks & Monopolies (4th ed.) ("Callman") § 18:9.

This mere descriptiveness/genericness renders: (i) EIP's asserted marks that are contestable and unregistered invalid (Count II[12]) and (ii) all of EIP's asserted marks conceptually weak under the first likelihood-of-confusion factor (Count IV).[13] *See Carnival Corp. v. SeaEscape Casino Cruises, Inc.*, 74 F. Supp. 2d 1261, 1265 (S.D. Fla. 1999). Regarding the latter, the conceptual weakness, combined with the commercial weakness due to the crowded field of third parties, indisputably tips the first—and one of the two most important—likelihood of confusion factors in Opposers' favor. *See Carnival Corp.*, 74 F. Supp. 2d at 1265-66; *see also Florida Int'l Univ. Bd. v. Florida Nat'l Univ.* ("*FIU*"), 830 F.3d 1242, 1255 (11th Cir. 2016).

---

[12] They lack secondary meaning for the same reasons they lack commercial strength. *See Tana v. Dantana's*, 611 F.3d 767, 773-77 (11th Cir. 2010).

[13] EIP's argument that B17 and 11USA seek cancellation of EIP's incontestable registrations on the ground of mere descriptiveness is a red herring. Opp. at 22. They seek cancellation of EIP's incontestable registrations in Count I on the ground of genericness, not mere descriptiveness. DE 468 at 93, ¶ 91; *see also* 15 U.S.C. § 1064(3).

**B.  The Record Evidence Contains Several Indicia of Genericness**

In *Badia*, which EIP cites repeatedly, the Court noted that "courts consider a variety of evidence relevant to the issue of genericness, including dictionary listings, usage in the popular and specialized media . . . and in industry, and usage by competitors . . . ." *Badia Spices, Inc. v. Gel Spice Co.*, No. 15-24391-Civ-Cooke/Torres, 2017 WL 2082794, *2 (S.D. Fla, May 15, 2017). Here, the record includes evidence in each category, including for the four industries in which EIP purports to operate: (i) hospitality; (ii) hotels; (iii) real estate; and (iv) travel. DE 451, ¶¶ 2, 45.

Dictionary definitions of "Eleven" include *the laudatory meaning that was the very reason EIP chose to use that term*, *i.e.*: "one more than ten." *See Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 11 n.5 (5th Cir. 1974) ("The dictionary definition of the word is an appropriate and relevant indication of the ordinary significance and meaning of the words to the public."). In the context of EIP's offerings, a "five star hotel" is generic for a luxury property with a range of amenities; it refers to an entire class of hotels, not one hotel. "Eleven" is equally generic (*e.g.*, an eleven out of ten). "Words which indicate that a product or service has a high value in relation to its price have been classified as generic …." Callman § 18:9. The media likewise uses "eleven" generically when mentioning why EIP adopted that common term. *See* Declaration of Jonathan W. Thomas ¶ 3, Ex. 1 at '5227 ("It is also a subtle nod to the cult film "Spinal Tap" where…[he] dials the knob on his amp to the highest level labeled 11" when other amps "are limited to a maximum volume of 10."); *Id.* ¶ 4, Ex. 2 at '5212 ("references…Spinal Tap, when Nigel Tufnel tells Marty DiBergi that his guitar goes up to 11, rather than the standard 10."); *Id.* ¶ 5, Ex. 3 at '5193; *Id.* ¶ 6, Ex. 4 at '5188. Moreover, despite hundreds if not thousands of third-party uses in the record, including in the markets in which EIP allegedly operates, EIP has protested only a fraction of them.[14] This, too, is evidence of genericness. *See Miller's Ale House*, 702 F.3d

---

[14] EIP allegedly uses its marks in connection with hospitality, hotel, rentals of real estate, and travel services. DE 451, ¶¶ 2, 45. Third-party uses in these markets are relevant to the classification of EIP's asserted marks as generic or descriptive for purposes of: (i) validity (registered and incontestable: generic; registered and contestable/unregistered: generic or descriptive) and (ii) conceptual strength (all asserted marks: generic or descriptive). But *all* third-party uses are relevant to the assessment of the commercial weakness of EIP's marks under the first likelihood-of-confusion factor, as well as the assessment of good faith, and the determination of whether "reverse" confusion applies. *See* 8/16/24 Opp. to EIP's Mot. to Exclude Third-Party Uses.

at 1318 (defendant "referenced numerous restaurants unaffiliated with Miller's that incorporate the term 'ale house' in their names").

### C. Statutory Fair Use Defeats All of EIP's Claims as to WERM

The record evidence confirms Movants' fair use as to WERM. Fair use "forbids a trademark registrant to appropriate a descriptive term for [its] exclusive use and so prevent others from accurately describing a characteristic of their goods.'" *Setai Hotel Acquisitions, LLC v. Luxury Rentals Miami Beach, LLC*, 2006 WL 7217730, at *2 (S.D. Fla. Dec. 9, 2016) (quoting *Int'l Stamp Art, Inc. v. U.S.P.S.*, 456 F.3d 1270, 1274 (11th Cir. 2006)). To that end—even as to incontestable marks—there is no infringement if the challenged use is: (i) descriptive; (ii) other than as a mark; and (iii) in good faith. *See* 15 U.S.C. § 1115(b). That is the case as to WERM.

Here, one of WERM's developers, PMG, has a practice of using a geographically descriptive "where"/"what" naming convention for real-estate projects—particularly in South Florida. For example, PMG (and Movants MRC and LDO) is developing "One West Twelve Residences," which will be residential condominiums at 11<u>2</u>9 N<u>W 1</u>st Court in Miami, as well as "One Twenty Brickell Residences," which will be residential condominiums at <u>120</u> SW 8th Street in Miami. DE 418 ¶ 219; DE 223-08 at 39:3-15; DE 275-3. Consistent with that practice, one of PMG's principals, Ryan Shear, testified that Movants combined "West," "Eleventh," "Residences," and "Miami," as well as a "W" and "11," and use them for their plain, ordinary meaning to denote that WERM will be *residential* condominiums at 18 North*west 11*th Street in *Miami*'s Park *West* neighborhood. DE 481 ¶ 219; DE 223-13 at 336:5-12, 394:10-15; DE 223-08 at 36:9-22. Conversely, Movants use the names of WERM's developers, and AIRBNB, as marks to identify the source of WERM and its collaboration with AirBnB. DE 481 ¶ 222.

The foregoing evidence establishes Movants' fair use of "West Eleventh Residences Miami" and "W11" as to WERM. *See* 15 U.S.C. § 1115(b)(4); *see also Setai Hotel Acquisitions, LLC*, 2006 WL 7217730, at *2 (fair use can apply when describing geographic locations); *Int'l Stamp Art, Inc.*, 456 F.3d at 1275 (good faith found where challenged use consistent with past practices and defendant used house mark) (citing *Cosmetically Sealed Industries, Inc.*, 125 F.3d at 30 ("The non-trademark use of the challenged phrase and the defendants' good faith are both evidenced by the fact that the source of the defendants' product is clearly identified by the prominent display of the defendants' own trademarks")); *but see Las Originales Pizza Inc. v.*

*Batabano Grp., Inc.,* 2022 WL 4369993, at *24 (S.D. Fla., Jul 18, 2022) (EIP case; fair use did not apply because defendant relied on attorney's "ipse dixit argument," not evidence).

      Nonetheless, EIP claims that Movants allegedly do not use "West Eleventh Residences Miami" and "W11" in a descriptive sense because "'West Eleventh' is not the property's address." Mot. at 24.[15] EIP is wrong. Statutory fair use requires only that the challenged "term refer to <u>a</u> characteristic of the [product].'" *Hard Candy LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1363 (11th Cir. 2019) (quoting *Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 952 (7th Cir. 1992)) (emphasis added). Here, "West Eleventh Residences Miami" and "W11" indisputably describe "a characteristic or quality of" WERM—*i.e.*, residential condominiums— *and* its geographic location. *See* MCCARTHY, § 14:3 ("A geographically descriptive term can indicate any geographic location on earth, such as: [….] streets and addresses"); *see also id.* n.10 (citing *Sand Hill Advisors, LLC v. Sand Hill Advisors, LLC*, 680 F. Supp. 2d 1107 (N.D. Cal. 2010) ("Sand Hill Advisors" geographically descriptive of advisory services provided on Sand Hill road)); *but see* Mot. at 24 (EIP citing *Resort Int'l, Inc v. Great Bay Hotel & Casino, Inc*., 1991 WL 352487, at *7 (D.N.J. Jan. 18, 1991) ("Paradise Island" not descriptive of location); *Commodores Ent. Corp. v. Thomas McClary*, 2015 WL 12843872, at *4 (M.D. Fla. Mar. 10, 2015) (defendant did not use challenged term to denote the "what" of his band); and *New West Corp. v. NYM Co. of Calif.*, 595 F.2d 1194, 1202 n.4 (9th Cir. 1979) ("New West" held "not descriptive of any particular location of the magazine")).

      EIP also claims that fair use does not apply because Movants allegedly use "West Eleventh Residences Miami" and "W11" as marks. Mot. at 24-5. No, they do not. "Geographically descriptive terms"—like "West Eleventh Residences Miami" and "W11"—"are not regarded as inherently distinctive. That means that to achieve distinctiveness and validity as a mark, the law requires that such terms must acquire a new 'secondary meaning.'" MCCARTHY, § 14:9 (citing, *inter alia*, *Nationwide Van Lines, Inc. v. Transworld Movers Inc.*, 2020 WL 4873713, at *2-3 (S.D. Fla. July 27, 2020) (Plaintiff's use of the word 'Nationwide' is used to describe a geographic location and is therefore descriptive"; "Nationwide" not valid as a mark absent secondary

---

[15] EIP's argument concerning Movants' marketing expert conveniently ignores two facts. First, Dr. Joachimsthaler was talking about WERM from a marketing perspective, not a trademark-classification perspective. Two, he nonetheless opined in his opening expert report that "West Eleventh Residences" describes the what and where of WERM. DE 219-36 ¶ 45.

meaning) *aff'd* 852 Fed. App'x. 604, 606-07 (11th Cir. 2021)); *see also Casey Key Resort, LLC v. CK Resorts JV, LLC*, 2021 WL 4893682, at *3-4 (M.D. Fla. Oct. 20, 2021) ("Casey Key Resort" and "Casey Key Resort Hotel" invalid as marks; "And although Casey's marks also include the words 'Resort' and 'Resort Hotel,' a mark is descriptive and not inherently distinctive when it combines a geographically descriptive term with another descriptive term"). As Opposers noted in their Amended Motion (at 24), there is no evidence in the record of "West Eleventh Residences Miami" or "W11" having acquired secondary meaning of or for WERM. Mot. at 24. Despite claiming that "West Eleventh Residences Miami" and "W11" appear in WERM's marketing materials and sales center, and on WERM in renderings thereof, EIP cites *no* evidence of secondary meaning, either.

Also proving Movants' use other than as marks are the facts that: (i) Movants use "West Eleventh Residences Miami" and "W11" as standalone, generic/descriptive phrases and not combined or within the developers' names or the AIRBNB marks, or with other generic/descriptive terms and (ii) neither Movants *nor EIP* have ever claimed to own trademark rights in those phrases; applied to register them as marks; or used them as trade names. In fact, EIP admittedly has never been known as "West Eleventh" (or "East Eleventh"). *Compare with* Mot. at 24-5 (EIP citing *DCS Real Est. Invs., LLC v. Yapor Corp.,* 2015 WL 12780447, at * 8 (M.D. Fla. Feb. 26, 2015) (defendant *had* applied to register the challenged term as a trademark; *did* claim to use the term as a mark, including as its trade name[16]; *La Potencia, LLC v. Chandler,* 2024 WL 1908628, at *15 (S.D. Fla. Apr. 30, 2024) (use within logo); *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 938 (10th Cir. 1983) (use as "secondary trademark"); *Rolex Watch U.S.A., Inc. v. Agarwal,* 2012 WL 12886444, at *8 (C.D. Cal. Dec. 17, 2012) (use of plaintiff's marks); *3Lions Publ'g, Inc. v. Interactive Media Corp.,* 389 F. Supp. 3d 1031, 1042 (M.D. Fla. 2019) (*same*); *VOX Amplification Ltd. v. Meussdorffer,* 50 F. Supp. 3d 355, 375 (E.D.N.Y. 2014) (*same*); *Safeway Stores, Inc. v. Safeway Props., Inc.,* 307 F.2d 495, 499 (2d Cir. 1962) (use in corporate name);

---

[16] EIP also cites this decision—and *Buccellati Holding Italia Spa v. Laura Buccelatti, LLC*, 5 F. Supp. 3d 1368, 1377 (S.D. Fla. 2014)—to support the argument that Movants' treated "West Eleventh Residences Miami" and "W11" as marks by conducting a trademark-clearance search for "West 11." Mot. at 25. EIP is wrong. Neither decision mentions a trademark search. Opposer's search also was consistent with PMG's practice of ensuring that project names do not violate any third party's putative rights. DE 481 ¶ 219; DE 223-13 at 381:11-23; DE 219-13 at Nos. 2, 17.

*adidas Am., Inc. v. Skechers USA, Inc.*, 2017 WL 3319190, at *3, *22-23 (D. Or., Aug. 3, 2017) (defendant used *other* terms to describe its "Supernova" shoe—*e.g.*, "Relaxed Fit"—indicating trademark use of "Supernova")).[17]

In a last-ditch effort, EIP claims that fair use does not apply because Movants chose not to use other allegedly available descriptors for WERM, which allegedly has caused actual confusion. Mot. at 24-5. Regarding the former, EIP claims Movants could have "use[d] many other terms, including the actual address" for WERM. *Id*. at 25. But WERM's street address—18 Northwest 11th Street—is not a "true *alternative*" name for WERM; rather, it is a longer version of the *same* name and abbreviation that Movants use. *Int'l Stamp Art, Inc.*, 456 F.3d at 1276. Regarding the latter, as discussed in Movants' Amended Motion and *supra*, EIP has no evidence of actual confusion. *Compare with Heron Dev. Corp. v. Vacation Tours, Inc.*, 2017 WL 2895921, at *13 (S.D. Fla. Apr. 13, 2017) (EIP case; defendant caused actual confusion to occur). But even if EIP had evidence of actual confusion, fair use still would apply. *See K-Permanent Makeup, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 122 (2004) ("If any confusion results, that is a risk the plaintiff accepted when it decided to identify its product with a mark that uses a well-known descriptive phrase") (internal quotations and citation omitted).

## IX.     CONCLUSION

For the foregoing reasons, the Court should deny the EIP Parties' Motion and, instead, grant summary judgment in Opposers' favor for the reasons discussed in their Amended Motion.

Dated: November 1, 2024

Respectfully submitted,

By: _/s *Robert H. Thornburg*_____
**ALLEN, DYER, DOPPELT & GILCHRIST, P.A.**
Robert H. Thornburg / Fla. Bar No. 630829
email: rthornburg@allendyer.com
Susan J. Latham / Fla. Bar No. 687391
email: slatham@allendyer.com
James R. Leahy / Fla. Bar No. 1044500
email: jleahy@allendyer.com
121 Alhambra Plaza, Suite 1250

---

[17] EIP also cites (at 24) *Ford Motor Co. v. O.E. Wheel Distribs., LLC,* 868 F. Supp. 2d 1350, 1368-9 (M.D. Fla. 2012). But the issue therein was "nominative fair use," which, unlike descriptive fair use, "occurs when a defendant uses plaintiff's mark to identify plaintiff's goods or services for the purpose of facilitating the sale of defendants' products." *Id*. Nominative fair use has no application to this case: EIP does not claim to own rights in "West Eleventh Residences Miami" or "W11"; Movants used those phrases to describe *Movants'* WERM.

Coral Gables, Florida 33134
Telephone:  305-374-8303
Facsimile:   305-374-8306

Ryan T. Santurri / Fla. Bar No. 15698
email: rsanturri@allendyer.com
Melissa Dangond / Fla. Bar No. 1025285
email: mdangond@allendyer.com
255 S. Orange Avenue, Suite 1401
Orlando, FL 32801
Tele.: 407-841-2330; Facsimile: 407-841-2343
 and

**MARTINEZ-CID LAW**
Jordi C. Martinez-Cid / Fla. Bar No. 100566
 email:  jmartinez-cid@martinez-cidlaw.com
        service@martinez-cidlaw.com.

Andy Hernandez / Fla. Bar. No. 1018581
email: ahernandez@martinez-cidlaw.com
1 S.E. 3rd Avenue, Suite 2300
Miami, Florida 33131
Telephone:        305-704-9162

*Attorneys for GR Opco, LLC d/b/a E11EVEN*

and

**MARCUS NEIMAN RASHBAUM & PINEIRO LLP**
Jeffrey E. Marcus, Esq.
Florida Bar No. 310890
jmarcus@mnrlawfirm.com
Jeffrey A. Neiman, Esq.
Florida Bar No. 544469
jneiman@mnrlawfirm.com
Bryan A. Almeida, Esq.
Florida Bar No. 1005558
balmeida@mnrlawfirm.com
One Biscayne Tower
2 S. Biscayne Blvd., Ste. 2530
Miami, Florida 33131
Telephone: (305) 400-4260

*Counsel for Counterclaim Defendants Property
Markets Group, Inc.; PMG-11th Street Ventures, LLC;
PMG-11th Street Ventures II, LLC; Michael Simkins,
Marc Roberts, Marc Roberts Companies LLC, and
Lion Development Opportunity Fund LLC*

and

**PEDERSEN & HOUPT, a Prof. Corp.**
Lawrence W. Byrne, Esq., Ill. Bar No. 6208752

26

*pro hac vice*
email:  lbyrne@pedersenhoupt.com
161 N. Clark Street, Ste. 2700
Chicago, Illinois 60601
Telephone:  312-261-2155
and

**WEISBERG IP LAW P.A.**
Elissa A. Tisdahl, Fla. Bar No. 85521
1232 N. University Drive
Plantation, FL 33322
Telephone: 954-828-1488

*Attorneys for 11USA Group, LLC and Dennis DeGori*
and

**KILPATRICK TOWNSEND & STOCKTON LLP**
Evan S. Nadel (Florida Bar. No. 165409)
Jonathan W. Thomas (admitted *pro hac vice*)
enadel@ktslaw.com
jwthomas@ktslaw.com
3 Times Square
New York, New York 10036
Tel.: 212.775.8856
and
R. Charles Henn, Jr. (admitted *pro hac vice*)
Shreya P. Desai (admitted *pro hac vice*)
Davis-Brook Caswell (admitted *pro hac vice*)
rhenn@ktslaw.com
spdesai@ktslaw.com
dbcaswell@ktslaw.com
1100 Peachtree Street. Suite 2800
Atlanta, Georgia 30309
Tel.: 404.815.6032

*Attorneys for Counterclaim-Defendants Block 17*
*Trustee, LLC; and Block 17 Residential Owner, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 1, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: _s/ Robert H. Thornburg_

## SERVICE LIST
*Case No.* 1:22-cv-24119-FAM/TORRES

| BERGER SINGERMAN LLP | KIRKLAND & ELLIS LLP |
|---|---|
| Gavin C. Gaukroger | Dale M. Cendali (admitted *pro hac vice*) |
| Florida Bar No. 76489 | dale.cendali@kirkland.com |
| ggaukroger@bergersingerman.com | Shanti Sadtler Conway (admitted *pro hac vice*) |
| Ana Carolina Varela | shanti.conway@kirkland.com |
| Florida Bar No. 123069 | Eric Loverro (admitted *pro hac vice*) |
| cvarela@bergersingerman.com | eric.loverro@kirkland.com |
| 1450 Brickell Avenue, Suite 1900 | 601 Lexington Avenue |
| Miami, FL 33131 | New York, NY 10022 |
| Telephone: (305) 755-9500 | Telephone: (212) 446-4800 *and* Miranda D. |
| *Attorneys for Eleven IP Holdings LLC,* | Means (admitted *pro hac vice*) |
| *Grassy Creek LLC, and CS Irwin LLC* | Miranda.means@kirkland.com |
| | 200 Clarendon Street |
| | Boston, MA 02116 |
| | Telephone: (617) 385-7500 |
| | *Attorneys for Eleven IP Holdings LLC,* |
| | *Grassy Creek LLC, and CS Irwin LLC* |

| | |
|---|---|
| KILPATRICK TOWNSEND & STOCKTON LLP<br>Evan S. Nadel (Florida Bar. No. 165409)<br>Jonathan W. Thomas (admitted *pro hac vice*)<br>enadel@ktslaw.com<br>jwthomas@ktslaw.com<br>3 Times Square<br>New York, New York 10020<br>Tel.: 212.775.8856<br>and<br>Shreya Desai (admitted *pro hac vice*)<br>spdesai@ktslaw.com<br>1100 Peachtree Street. Suite 2800<br>Atlanta, Georgia 30309<br>Tel.: 404.815.6032<br>*Attorneys for Counterclaim-Defendants Block 17 Trustee, LLC; and Block 17 Residential Owner, LLC* | MARCUS NEIMAN RASHBAUM & PINEIRO LLP<br>Jeffrey E. Marcus, Esq.<br>Florida Bar No. 310890<br>jmarcus@mnrlawfirm.com<br>Jeffrey A. Neiman, Esq.<br>Florida Bar No. 544469<br>jneiman@mnrlawfirm.com<br>Bryan A. Almeida, Esq.<br>Florida Bar No. 1005558<br>balmeida@mnrlawfirm.com<br>One Biscayne Tower<br>2 S. Biscayne Blvd., Ste. 2530<br>Miami, Florida 33131<br>Telephone: (305) 400-4260<br>*Counsel for Counterclaim Defendants Property Markets Group, Inc.; PMG-11th Street Ventures, LLC; PMG-11th Street Ventures II, LLC; Michael Simkins, Marc Roberts, Marc Roberts Companies LLC, and Lion Development Opportunity Fund LLC* |
| | PEDERSEN & HOUPT, a Prof. Corp.<br>Lawrence W. Byrne, Esq., Ill. Bar No. 6208752<br>*pro hac vice*<br>email:  lbyrne@pedersenhoupt.com<br>161 N. Clark Street, Ste. 2700<br>Chicago, Illinois 60601<br>Telephone:  312-261-2155<br>and<br>Weisberg IP Law P.A.<br>Elissa A. Tisdahl, Fla. Bar No. 85521<br>1232 N. University Drive<br>Plantation, FL 33322<br>Telephone: 954-828-1488<br><br>*Attorneys for 11USA Group, LLC and Dennis DeGori* |